Jesse Kodadek
Elliott McGill
PARSONS BEHLE & LATIMER
127 East Main Street, Suite 301
Missoula, MT 59802
(406) 317-7220
jkodadek@parsonsbehle.com
emcgill@parsonsbehle.com

Jason L. Lichtman*
LIEFF CABRASER HEIMANN &
BERNSTEIN
250 Hudson Street, 8th Floor
New York, NY 10013-1413
(212) 355-9500
jlichtman@lchb.com

Amy E. Keller*
DiCELLO LEVITT LLP
Ten North Dearborn St., Sixth Floor
Chicago, IL 60602
(312) 214-7900
akeller@dicellolevitt.com

*Attorneys for Plaintiff and the Proposed Class*
*(\*indicates pro hac vice applications forthcoming)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| MARI MILLER, on behalf of herself and all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>SNOWFLAKE, INC.; AT&T INC.; and AT&T MOBILITY, LLC,<br><br>*Defendants.* | CV-24-94-BU-BMM<br><br>CLASS ACTION COMPLAINT & JURY DEMAND |

1

Plaintiff Mari Miller ("Plaintiff") brings this class action complaint against Defendants Snowflake, Inc. ("Snowflake"), AT&T Inc. and AT&T Mobility, LLC (collectively "AT&T" and together with Snowflake, "Defendants"), on behalf of herself and all others similarly situated. Plaintiff makes the following allegations based upon personal knowledge as to her own actions and upon information and belief as to all other matters:

## **INTRODUCTION**

1.      Plaintiff brings this class action against Defendants for their failure to secure and safeguard Plaintiff's and Class members' highly sensitive phone call and text message records, including their phone numbers, the phone numbers of every AT&T customer they interacted with, the date of each such call and text, and cell site identification numbers for those interactions ("Private Call Information" or "PCI").

2.      Plaintiff, a non-AT&T customer, frequently interacted with AT&T customers, and now records of those interactions for a more than six-month period in 2022 are in the hands of criminals.

3.      The Data Breach, defined below, exposed the PCI of 110 million AT&T customers, but just as importantly, it exposed the PCI of every non-AT&T customer when they communicated with AT&T customers. Plaintiff and Class members, like nearly every American, interacted with AT&T customers and now

2

private and sensitive information about who they communicate with and when they communicate with them is no longer private.

4.    By allowing bad actors to access and exfiltrate the call records of 110 million AT&T customers, Defendants harmed not just those individuals, but every person who called or texted with an AT&T customer during the relevant time period.

5.    Defendant AT&T, Inc. is one of the largest telecommunications companies in the United States.[1] It touts itself as "one of America's critical infrastructure providers."[2] Defendant AT&T Mobility, LLC is a subsidiary of AT&T, Inc. and is the second largest wireless carrier in the United States.

6.    Defendant Snowflake is a "fully managed SaaS (software as a service) that provides a single platform for data warehousing, data lakes, data engineering, data science, data application development, and secure sharing and consumption of

---

[1] *E.g.*, Maleha Afzal, *5 Biggest Telecom Companies in the US*, INSIDER MONKEY (Mar. 12, 2024), https://www.insidermonkey.com/blog/5-biggest-telecom-companies-in-the-us-1272969/2/; Nathan Reiff, *10 Biggest Telecommunications (Telecom) Companies*, INVESTOPEDIA (Sept. 29, 2023), https://www.investopedia.com/articles/markets/030216/worlds-top-10-elecommunications-companies.asp.
[2] *2023 Annual Report*, AT&T, https://investors.att.com/financial-reports/annual-reports/2023 (last visited Aug. 20, 2024).

real-time/shared data."[3] Snowflake has approximately 9,822 customers from around the world,[4] including AT&T.[5]

7.    In the regular course of its business, AT&T collects and maintains the PCI of both its customers and the customers of other telecommunications providers that call and text with AT&T customers, including Plaintiff and Class members.

8.    AT&T made the choice to entrust Snowflake with hundreds of millions of AT&T and non-AT&T customers' PCI through Snowflake's cloud-based data storage services provided to AT&T.[6]

9.    On July 12, 2024, AT&T announced that records of calls and texts of "nearly all" 110 million of its wireless customers and customers of certain third-

---

[3] Praneal Narayan, *What is the Snowflake Data Platform?*, SNAPLOGIC (Mar. 21, 2023),
https://www.snaplogic.com/blog/snowflake-data-platform.
[4] *About Snowflake*, SNOWFLAKE,
https://www.snowflake.com/en/company/overview/about-snowflake/ (last visited Aug. 21, 2024).
[5] *See AT&T Provides Faster Insights While Lowering Estimated Annual Costs by 84%*,
SNOWFLAKE, https://www.snowflake.com/en/customers/all-customers/case-study/att/ (last
visited Aug. 21, 2024).
[6] *See AT&T Provides Faster Insights While Lowering Estimated Annual Costs by 84%*,
SNOWFLAKE, https://www.snowflake.com/en/customers/all-customers/case-study/att/ (last visited Aug. 19, 2024).

party mobile virtual network operators ("MVNOs") that leased AT&T's network,[7] had been illegally downloaded from its workspace on Snowflake's cloud platform between April 14 and April 25, 2024, in a massive security breach ("Data Breach").

10.    The stolen data contains records of calls and text messages, including PCI, during a six-month period between May 1, 2022 and October 31, 2022, and on January 2, 2023.

11.    AT&T owed a duty to Plaintiff and Class members under federal law (including duties imposed by Section 5 of the Federal Trade Commission Act (the "FTC Act")), common law, and pursuant to industry standards, to protect the PCI it collected from unauthorized access and disclosure by implementing and maintaining reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class members' PCI from unauthorized access and disclosure. AT&T was not absolved of this duty merely by storing its customers' and non-customers' PCI with Snowflake. Rather, it is well known and foreseeable that threat actors would search for and breach the weakest link in the chain of AT&T's cybersecurity, as they did here.

---

[7] According to public resources, those MVNOs likely include wireless service providers such as Boost Mobile, Cricket Wireless, H2O, and Straight Talk Wireless. *See*, https://www.whistleout.com/CellPhones/Guides/att-mvnos (last visited Aug. 21, 2024).

12.     AT&T breached that duty by failing to implement and maintain—or by sharing Plaintiff's and Class members' PCI with third parties who failed to implement and maintain—reasonable security procedures and practices to protect Plaintiff's and Class members' PCI from unauthorized access and disclosure.

13.     Despite collecting highly sensitive information from cell phone users throughout the United States, AT&T failed to adequately implement basic and necessary security protocols and failed to ensure that Snowflake implemented basic and necessary security protocols, most notably the requirement to use multi-factor authentication for users to log in to Snowflake's systems, which, if in place, would have prevented the Data Breach from occurring.

14.     Snowflake owed a duty to Plaintiff and Class members under federal law (including duties imposed by Section 5 of the FTC Act), common law, and pursuant to industry standards, to protect the PCI it stored for AT&T from unauthorized access and disclosure by implementing and maintaining reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class members' PCI from unauthorized access and disclosure. Snowflake breached that duty by failing to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PCI from unauthorized access and disclosure, most notably the requirement to use multi factor authentication for users.

15.    Despite storing highly sensitive information on its platform, Snowflake failed to adequately implement basic and necessary security protocols which, if in place, would have prevented the Data Breach from occurring.

16.    As a result of Defendants' inadequate security and breach of their duties and obligations to Plaintiff and Class members, the Data Breach occurred, compromising Plaintiff's and Class members' PCI and resulting in its disclosure on the dark web.

17.    As a direct result of the Data Breach, Plaintiff and Class members have suffered fraud and/or will continue to be exposed to a heightened and imminent risk of fraud and identity theft, potentially for the rest of their lives. Plaintiff and Class members must now and in the future closely monitor their financial and other accounts to guard against social engineering attacks and identity theft.

18.    Plaintiff and Class members may also incur out-of-pocket costs for purchasing credit monitoring services, identity theft protection services, social engineering protection services, credit freezes, credit reports, and other protective measures to deter and detect identity theft.

19.    As a direct and proximate result of the Data Breach and subsequent exposure of their PCI, Plaintiff and Class members have suffered, and will continue to suffer damages and economic losses in the form of lost time needed to take

appropriate measures to avoid unauthorized and fraudulent charges, putting alerts on their credit files, and dealing with spam phone calls, letters, and emails received as a result of the Data Breach.

20.    As a direct and proximate result of the Data Breach and subsequent exposure of their PCI, Plaintiff and Class members have suffered, and will continue to suffer, an invasion of their property interest in their own PCI such that they are entitled to damages from Defendants for unauthorized access to, theft of, and misuse of their PCI. These harms are ongoing, and Plaintiff and Class members will suffer from future damages associated with the unauthorized use and misuse of their PCI as thieves will continue to use the information to obtain money and credit in their names for several years.

21.    Plaintiff brings this action on behalf of herself and all persons whose PCI was exposed as a result of the Data Breach, and asserts claims for negligence and breach of contract as to a third party beneficiary, and seeks monetary damages, statutory damages, punitive damages, declaratory relief, injunctive relief, equitable relief, reasonable attorneys' fees, costs, and expenses incurred in bringing this action, and all other relief authorized by law.

## **PARTIES**

22.    Plaintiff Mari Miller is a citizen and resident of Michigan.

23.     Defendant Snowflake Inc. is a Delaware corporation with its principal place of business in Bozeman, Montana, where its "Principal Executive Offices" are located.

24.     Defendant AT&T, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.

25.     Defendant AT&T Mobility, LLC is a Delaware company with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. There are more than 100 putative class members and at least some members of the proposed Class, including Plaintiff, have a different citizenship from Defendants. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

27.     This Court has general personal jurisdiction over Snowflake because Snowflake has its headquarters in this district and is authorized to and does regularly conduct business in this District.

28.     This Court has personal jurisdiction over AT&T, Inc. and AT&T Mobility, LLC because they regularly conduct business in this State, and each of

them has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over AT&T, Inc. and AT&T Mobility, LLC would not offend traditional notions of fair play and substantial justice. AT&T hired Montana-based company, Snowflake, and paid Snowflake a fee in this District, to store Plaintiff's and Class members' PCI. AT&T, thus, benefitted from the opportunity to do business in the State of Montana. AT&T's relationship with Snowflake and storing the data on Snowflake's cloud-based system resulted in the accrual of all claims herein (the Data Breach at issue). Thus, AT&T has consented to be subject to personal jurisdiction in Montana.

29.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (1) & (2) because a substantial part of the events and omissions giving rise to this action occurred in and emanated from this District.

30.    Divisional Venue in the Butte Division is proper under Local Rule 3.2(b) and under Montana Code Annotated § 25–2–122(1), because a significant amount of the acts and omissions occurred in and emanated from Gallatin County.

## FACTUAL ALLEGATIONS

### *Overview of Defendants and Their Promises*

31.     Defendant AT&T "provides more than 100 million U.S. consumers with communications experiences across mobile and broadband."[8]

32.     AT&T admits that it is its "duty under federal law to protect the confidentiality of" the call records information AT&T collects, including PCI.[9]

33.     AT&T claims it maintains "a network and information security program that is reasonably designed to protect our information, and that of our customers, from unauthorized risks to their confidentiality, integrity, or availability."[10]

34.     Further, when disclosing the Data Breach, AT&T reaffirmed its promises that: "We hold ourselves to a high standard and commit to delivering the experience that you deserve. We constantly evaluate and enhance our security to address changing cybersecurity threats and work to create a secure environment for

---

[8] AT&T, Investor Profile, https://investors.att.com/investor-profile (last visited Aug. 19, 2024).

[9] AT&T Privacy Notice (effective date December 11, 2023 through July 16, 2024), https://web.archive.org/web/20231212012645/https://about.att.com/privacy/privacy-notice.html.

[10] AT&T Inc., 2023 Annual Report, https://investors.att.com/financial-reports/annual-reports/2023 (last visited Aug. 20, 2024).

you. We invest in our network's security using a broad array of resources including people, capital, and innovative technology advancements."[11]

35.    As a condition of providing telecommunication services, including allowing its customers to call and text non-AT&T customers, and allowing non-AT&T customers to call and text AT&T customers, AT&T collected, stored, shared, and maintained Plaintiff's and Class members' PCI, including on the Snowflake cloud-based data storage systems involved in the Data Breach.

36.    AT&T shared Plaintiff and Class members' PCI with Snowflake in the course of using services provided by Snowflake.

37.    Snowflake is a cloud storage service with a nearly 20% share of the data hosting market and is used by 9,437 customers, including globally ranked, industry leading companies such as AT&T, Adobe, Kraft Heinz, Mastercard, HP, Nielsen, Novartis, PepsiCo, Siemens, Advance Auto Parts, Ticketmaster, Santander Bank, Anheuser-Busch, Allstate Insurance, Mitsubishi, Neiman Marcus, Progressive, State Farm, and NBC Universal among many others.[12]

---

I.    [11] *Unlawful access of customer data*, AT&T (July 24, 2024), https://www.att.com/support/article/myaccount/000102979?source=EPcc000000000000U (last visited Aug. 19, 2024).

[12] Seraiu Gatlan, *Advance Auto Parts stolen data for sale after Snowflake attack*, Bleeping Comput. (June 5, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-stolen-data-for-sale-after-snowflake-attack/; Symmetry, *What We Know So Far about the*

38.    Snowflake provides digital warehouses, known as "Snowflake Data Clouds" for its clients, and as a result has access to, stores, and maintains huge datasets of Personal Information for its corporate clients.[13] Snowflake is responsible for developing and maintaining environments which collect and process personal data for hundreds of millions of Americans.

39.    In the regular course of its business, Snowflake provided cloud-based data storage services to AT&T, including storing Plaintiff's and Class members' PCI.[14]

40.    Snowflake included privacy policies and commitments to maintain the confidentiality of data stored in its digital warehouses as terms of contracts with its corporate clients, including AT&T. Through contract terms and representations to its corporate clients and the public Snowflake promised to take specific measures to protect the data entrusted to it by its corporate clients, including Plaintiff's and

---

*Snowflake "Breach"* (June 6, 2024), https://www.symmetry-systems.com/blog/what-we-know-so-far-about-the-snowflake-breach/ (last visited Aug. 20, 2024).

[13] Snowflake Inc., *Data Cloud Capabilities*, https://www.snowflake.com/en/data-cloud/what-is-data-cloud/data-cloud-capabilities/ (last visited Aug. 20, 2024)

[14] *See* Snowflake Inc., *AT&T Provides Faster Insights While Lowering Estimated Annual Costs by 84%*, https://www.snowflake.com/en/customers/all-customers/case-study/att/ (last visited Aug. 19, 2024).

Class members' PCI, and as such they are intended third-party beneficiaries of Snowflake's contracts.[15]

41.    Snowflake's "Shared Responsibility Model" describes "a framework that outlines the division of security responsibilities between the Snowflake platform provider and our end users. It helps establish a clear understanding of who is responsible for which security controls and practices to ensure a collaborative, yet accountable, approach to security."[16]

42.    Under this framework, Snowflake is responsible for, among other things, "[e]ncrypt[ing] data at rest (for data managed by Snowflake) and in transit [and] [e]nsur[ing] compliance with data deletion privacy laws and contractual agreements." It is also responsible for "[a]dopt[ing] industry-standard best practices" with regard to Identity and Access Management, which is a cybersecurity discipline that limits access to information by users of the platform.

43.    According the Shared Responsibility Model, AT&T is responsible for, among other things, "[e]ncrypt[ing] data stored in the external stage…" In terms of Identity and Access Management, Snowflake claims that AT&T is responsible for

---

[15] Snowflake Privacy Policy (Nov. 24, 2023), https://web.archive.org/web/20240218162854/https://www.snowflake.com/privacy-policy/ (last visited Aug. 20, 2024).
[16] Snowflake Inc., *Shared Responsibility Model*, https://www.snowflake.com/en/resources/report/snowflake-shared-responsibility-model/ (last visited Aug. 23, 2024).

"us[ing] secure authentication methods with MFA,…conduct[ing] regular audits," and "[f]ollow[ing] industry best practices for securing the endpoints connecting to Snowflake."[17]

44.    Both AT&T and Snowflake failed to encrypt or redact Plaintiff's and Class members' PCI.

45.    In its Privacy Policy, Snowflake promises it takes "all reasonable and appropriate steps to protect your personal information in an effort to prevent loss, misuse, and unauthorized access, disclosure, alteration and destruction."[18] Snowflake further promises it uses "appropriate technical and organizational measures to protect your personal information."[19] Snowflake also promises it will not disclose personal information other than in specific circumstances enumerated in its Privacy Policy.[20]

46.    Snowflake "supports multi-factor authentication (i.e. MFA) to provide increased login security for users connecting to Snowflake," and MFA support "is

---

[17] Snowflake Inc., Shared Responsibility Model at 3-4 (Sept. 2023), https://www.snowflake.com/en/resources/report/snowflake-shared-responsibility-model/ (last visited Aug. 23, 2024).
[18] *Snowflake Privacy Notice* (Mar. 6, 2024), https://www.snowflake.com/privacypolicy/ [hereinafter, the "*Snowflake Privacy Policy*"].
[19] *Id*.
[20] *Id*.

managed completely by Snowflake."[21] Though Snowflake could require that all of its customers use MFA, it did not do so prior to the Data Breach. Instead, Snowflake's "users must enroll themselves."[22] Predictably, many of Snowflake's customers, including AT&T, did not deploy MFA on administrators' accounts.

47.    MFA administrator enforcement is the industry standard.[23] "[M]ost SaaS (soft-as-a-service) vendors, once deployed as an enterprise solution, allow administrators to enforce MFA…they require every user to enroll in MFA when they first login and make it no longer possible for users to work without it."[24] A data security firm's principal simply noted it is "surprising that the built-in account management within Snowflake doesn't have more robust capabilities like the ability to enforce MFA."[25]

---

[21] Snowflake Inc., *Multi-factor authentication (MFA)*, https://docs.snowflake.com/en/user-guide/security-mfa (last visited Aug. 19, 2024).

[22] *Id*.

[23] Solomon Klappholz, *With hundreds of Snowflake credentials published on the dark web, it's time for enterprises to get MFA in order*, ITPro. (June 7, 2024), https://www.itpro.com/security/cyber-attacks/with-hundreds-of-snowflake-credentials-published-on-the-dark-web-its-time-for-enterprises-to-get-mfa-in-order (last visited Aug. 20, 2024).

[24] *Id*.

[25] Shane Snider, *Snowflake's Lack of MFA Control Leaves Companies Vulnerable, Experts Say*, Info. Week (June 5, 2024), https://www.informationweek.com/cyber-resilience/snowflake-s-lack-of-mfa-control-leaves-companies-vulnerable-experts-say (last visited Aug. 20, 2024).

48.     MFA is also recommended by the federal Cybersecurity & Infrastructure Security Agency (CISA) housed within the U.S. Department of Homeland Security. According to a January 2022 Fact Sheet published by CISA, "[i]mplementing MFA makes it more difficult for a threat actor to gain access to …information systems, such as remote access technology, email, and billing systems, even if passwords or PINs are compromised through phishing attacks or other means." CISA also instructs businesses that they should "[c]onsider enforcing MFA on Internet-facing systems," like cloud-based computing systems, "and that "the degree of protection provided vary depending on the solutions selected and the platforms to be protected, so match the capability to the need."[26] Here, where the PCI of every person who called or texted an AT&T customer was at stake, use of MFA was more than appropriate.

49.     Many of the compromised access credentials used by these cybercriminals had been acquired as early as 2020 and Snowflake could have prevented this Data Breach by requiring all accounts to regularly update their passwords to current standards, monitor infostealer marketplaces for compromised

---

[26] U.S. Dep't Homeland Sec., Cybersec. & Infrastructure Sec. Agency (CISA), Fact Sheet: Multi-Factor Authentication (Jan. 2022), https://www.cisa.gov/sites/default/files/publications/MFA-Fact-Sheet-Jan22-508.pdf.

credentials, and prevent access to the platform by these accounts until the compromised passwords had been updated accordingly.

50.    Each Defendant could also have required MFA for all accounts, better monitored their accounts and systems to detect unusual activity or activity associated with unauthorized access, including by implementing IP filters and limiting access to their network environments to only necessary users.

51.    Snowflake, as a data cloud service provider, is well aware that certain basic security measures are critical to protecting sensitive information and that these include implementing MFA requirements and enabling administrator controls to mandate MFAs for its users.

52.    AT&T likewise knows the importance of MFA. According to AT&T, "[t]he majority of data breaches are caused by brute force attacks on credentials."[27] AT&T even has its own MFA application, AT&T MFA, which it describes as "AT&T's secure multi-factor authenticator that significantly improves both business and personal account login security."[28]

---

[27] AT&T Bus., *Secure access to your corporate network and prevent identify fraud with AT&T Multi-Factor Authenticator* (Sept. 3, 2024), https://cdn-cybersecurity.att.com/docs/att-multi-factor-authenticator.pdf (last visited Aug. 20, 2024).
[28] Apple App Store, *AT&T MFA*, https://apps.apple.com/us/app/at-t-mfa/id6444501887 (last visited Aug. 20, 2024).

53.     Despite recognizing their duty to do so, Defendants have not implemented reasonable cybersecurity safeguards or policies to protect consumers' PCI or supervised their IT or data security agents and employees to prevent, detect, and stop breaches of their systems. As a result, Defendants left significant vulnerabilities in their systems for cybercriminals to exploit and gain access to consumers' PCI.

### ***The Data Breach***

54.     Plaintiff and Class members are, or were, customers of telecommunications carriers other than AT&T who made and received calls and texts from/to customers of AT&T, the records of which were shared by AT&T with Snowflake.

55.     On July 12, 2024, AT&T announced that records of calls and texts of "nearly all" 110 million of its wireless customers and customers of MVNOs had been illegally downloaded from its workspace on a third-party cloud platform between April 14 and April 25, 2024, in a massive security breach ("Data Breach").

56.     An AT&T spokesperson confirmed that the data was exposed "on 'AI data cloud' provider Snowflake[.]"[29]

---

[29] Jon Brodkin, Nearly all AT&T subscribers' call records stolen in Snowflake cloud hack, Ars Technica (July 12, 2024) https://arstechnica.com/tech-policy/2024/07/nearly-all-att-subscribers-call-records-stolen-in-snowflake-cloud-hack/ (last visited Aug. 20, 2024).

57.    The AT&T stolen data contains records of calls and text messages during a six-month period between May 1, 2022 and October 31, 2022, and on January 2, 2023.

58.    In 2022, AT&T, together with Verizon and T-Mobile, accounted for approximately 94% of overall mobile phone subscriptions in the U.S.[30]

59.    The Data Breach accordingly exposed the PCI of nearly every person in the United States with a cell phone number.

60.    The compromised information is uniquely sensitive. For example, cell site identification numbers can be used to determine the approximate location of where a call was made or text message sent. Cybercriminals can also now identify relationships among phone numbers, allowing hackers to make scams more believable. With the compromised PCI, hackers can determine which banks, medical providers, schools, charities, stores, and other individuals a person is in contact with, further expanding the range and effectiveness of phishing and other attempts to trick impacted individuals into giving up yet more personal or financial information.[31]

---

[30] Yahoo!Fin., *United States (US) Telecom Operators Intelligence Report 2023 Featuring Top 3 Providers* (Oct. 11, 2023), https://finance.yahoo.com/news/united-states-us-telecom-operators-124800809.html (last visited Aug. 19, 2024).

[31] Ramishah Maruf, *How AT&T customers can protect themselves in the latest data breach*, CNN (July 12, 2024 4:54 PM),

61.    Telephone numbers also carry a "treasure trove of information that can be harnessed for various purposes."[32] Even "imprecise and sparse telephone metadata" could allow a cybercriminal to infer a person's home location.[33]

62.    While the PCI stolen in the Data Breach does not include customer names, AT&T itself admitted, in disclosing the Data Breach, that "there are often ways, using publicly available online tools, to find the name associated with a specific telephone number."[34] Once you have a name, the stolen data can then be used to "identify key relationships, pinpoint vulnerabilities, and craft highly sophisticated attacks"[35]

63.    Telephone numbers, even when anonymized, are "trivially reidentifiable" through methods such as basic web searches.[36]

---

https://www.cnn.com/2024/07/12/business/att-customers-data-breach-protection/index.html# (last visited Aug. 20, 2024).

[32] Jonathan Mayer et al., *Evaluating the privacy properties of telephone metadata*, 113 PNAS 5536, 5538 (2016).

[33] *Id*.

[34] AT&T, Form 8-K (July 12, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000732717/000073271724000046/t-0240506.htm.

[35] Jonathan Grieg, *AT&T reportedly paid ransom for deletion of stolen call logs after culprit allegedly detained*, The Record (July 15, 2024), https://therecord.media/att-ransom-data-breach (last visited Aug. 20, 2024).

[36] Jonathan Mayer et al., *Evaluating the privacy properties of telephone metadata*, 113 PNAS 5536, 5538 (2016).

64.    Telephone metadata such as that involved in the Data Breach also enables cybercriminals to determine sensitive traits and characteristics of Plaintiff and Class members, such as potential medical conditions, relationship status, religious affiliation, or firearm ownership.[37]

65.    The potential exposure of PCI is particularly alarming, according to Secure Cyber Defense CEO Shawn Waldman, because this type of data allows hackers to pinpoint locations based on phone numbers.[38] Jake Williams, a former hacker for the National Security Agency, said call data records "are a gold mine in intelligence analysis because they can be used to understand who is talking to who — and when."[39] This type of information can be used to craft highly sophisticated attacks. It can also be used to circumvent SMS-based multifactor authentication security measures.[40]

66.    The potential for triangulation of customers' locations from compromised cell site identification numbers further "adds a physical dimension to

---

[37] *Id*. at 5539-40.

[38] Stephanie Schappert, *AT&T reports arrest made in April hack, updates affected customers*, cybernews (July 18, 2024), https://cybernews.com/news/att-breach-hack-reports-arrest-made/ (last visited Aug. 20, 2024).

[39] Lily H. Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, WIRED, https://www.wired.com/story/att-phone-records-breach-110-million/ (last visited Aug. 20, 2024).

[40] Jonathan Grieg, *AT&T reportedly paid ransom for deletion of stolen call logs after culprit allegedly detained*, The Record (July 15, 2024), https://therecord.media/att-ransom-data-breach (last visited Aug. 20, 2024).

the already extensive privacy violation and could expose individuals to highly targeted and convincing social engineering attacks, not to mention compromising [their] physical security…."[41]

67.    Thus, even without contents of communications, the compromised metadata has "major implications for people's privacy and security."[42]

68.    AT&T recognizes that Plaintiff and Class members face an increased risk of phishing and smishing attacks, and other online fraud and online threats because of the Data Breach warning Plaintiffs and Class Members:

**What can I do to help protect myself from phishing, smishing, and other online fraud?**

- Only open text messages from people that you know and trust.
- Don't reply to a text from an unknown sender with personal details.
- Go directly to a company's website. Don't use links included in a text message. Scammers can build fake websites using forged company logos, signatures, and styles.
- Make sure a website is secure by looking for the "s" after the http in the address. You can also look for a lock icon at the bottom of a webpage. [43]

---

[41] Nate Nelson, *AT&T Breach May Also Impact Millions of Boost, Cricket, H2O Customers*, DarkReading (July 12, 2024), https://www.darkreading.com/cyberattacks-data-breaches/att-breach-may-also-impact-millions-of-boost-cricket-h2o-customers (last visited Aug. 21, 2024).

[42] Lily H. Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, WIRED, https://www.wired.com/story/att-phone-records-breach-110-million/ (last visited Aug. 20, 2024).

[43] *Unlawful access of customer data*, AT&T (July 24, 2024), https://www.att.com/support/article/myaccount/000102979?source=EPcc000000000000U  (last visited Aug. 19, 2024).

69.     According to an investigation by cybersecurity incident response firm Mandiant, who worked with Snowflake to investigate the Data Breach,[44] there is "a threat campaign targeting Snowflake customer database instances with the intent of data theft and extortion."[45] Mandiant attributed the Data Breach to a cybercriminal group called "UNC5537," calling them "a financially motivated threat actor…systematically compromising Snowflake customer instances using stolen customer credentials, advertising victim data for sale on cybercrime forums, and attempting to extort many of the victims."[46]

70.     "UNC5537 obtained access to multiple organizations' Snowflake customer instances via stolen customer credentials."[47] Those credentials "allowed the threat actor to gain access to the affected customer accounts and led to the export of a significant volume of customer data from the respective Snowflake customer instances."[48]

---

[44] Zack Whittaker, AT&T says criminals stole phone records of 'nearly all' customers in new data breach, TechCrunch (July 12, 2024 3:27 AM), https://techcrunch.com/2024/07/12/att-phone-records-stolen-data-breach/.

[45] Mandiant, *Blog: UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, Google Cloud (June 10, 2024), https://cloud.google.com/blog/topics/threatintelligence/unc5537-snowflake-data-theft-extortion.

[46] *Id*.

[47] *Id*.

[48] *Id*.

71.    One of the "primary factors" Mandiant identified for UNC5537's successful compromises of Snowflake is that the "impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password."[49]

72.    At the time of the Data Breach, neither AT&T nor Snowflake required all AT&T's Snowflake user accounts to have MFA in place.

73.    Although AT&T discovered the Data Breach on April 19, 2024, AT&T did not begin to notify impacted AT&T customers about the Data Breach until approximately July 12, 2024, over two months after the Data Breach was discovered.[50]

74.    AT&T and Snowflake never notified the non-AT&T customers, like Plaintiff and Class members, whose PCI was collected and stored by Defendants, and so were also victims of the Data Breach.

75.    Defendants' failure to notify Plaintiff and Class members that their PCI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that data before Plaintiff and Class members could take affirmative steps to protect their

---

[49] *Id.*
[50] Zack Whittaker, *AT&T says criminals stole phone records of 'nearly all' customers in new data breach*, TechCrunch (July 12, 2024 3:27 AM), https://techcrunch.com/2024/07/12/att-phone-records-stolen-data-breach/.

sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their PCI will be misused and their identities will be (or already have been) stolen and misappropriated.

76.    Plaintiff's and Class members' PCI was compromised, accessed, and unlawfully stolen in the Data Breach and has now been released to the dark web.[51]

77.    Multiple references to "SNOWFLAKE" in the leaked materials shows that the PCI affiliated with Snowflake's customers such as AT&T was stolen from Snowflake's cloud storage platform.[52]

78.    The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect the sensitive data in their possession, including Plaintiffs' and Class members' PCI, from a foreseeable and preventable cyber-attack.

79.    Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class members' PCI was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the PCI from those risks left that property in a dangerous condition.

---

[51] Quentin Bourgue & Sekoia TDR, IO Sekoia Blog (May 11, 2023), https://blog.sekoia.io/overview-of-the-russian-speaking-infostealer-ecosystem-the-logs/ (last visited Aug. 20, 2024).
[52] *Id*.

80.      Plaintiff's and Class members' identities are now at a heightened risk of exposure because of Defendants' negligent conduct since the PCI that Defendants collected and maintained is now in the hands of data thieves.

81.      The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal personal information, including PCI, to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes.

### *AT&T Has Suffered Multiple Data Breaches In Recent Years*

82.      The Data Breach is the second breach of AT&T customer data this year. Earlier this year data of over 70 million AT&T customers—including encrypted passcodes for accessing AT&T customer accounts—was published on a cybercrime forum. AT&T confirmed the data was authentic, but does not know whether the data originated from AT&T or one of its vendors.[53] The breached data includes names, phone numbers, postal addresses, and Social Security numbers.[54]

---

[53] Becky Bracken, *AT&T Confirms 73M Customers Affected in Data Leak*, DarkReading (Apr. 1, 2024), https://www.darkreading.com/remote-workforce/att-confirms-73m-customers-affected-data-leak; AT&T Inc., *AT&T Addresses Recent Data Set Released on the Dark Web* (Mar. 30, 2024), https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html (last visited Aug. 20, 2024).
[54] *Id.*

Based on AT&T's preliminary analysis, the data appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders.[55] AT&T claims there is no evidence this was the result of unauthorized access to its systems.[56]

83.    In the last ten years, AT&T was also the subject of several additional data breaches involving customer data in 2014, 2020, 2022, and 2023.[57]

84.    Snowflake is also well aware of the fact that it is a high-value target for cybercriminals. In March 2023, the FTC sought comments from Computing Providers (like Snowflake) and their impact on end users, customers, companies, and other businesses across the economy (like AT&T) on the business practices of cloud computing providers including issues related to the market power of these companies, impact on competition, and potential security risks.[58]

---

[55] *Id.*

[56] *Id.*

[57] Catherine Reed, *AT&T Data Breaches: Full Timeline Through 2023*, Firewall Times (Oct. 5, 2023), https://firewalltimes.com/att-data-breaches/ (last visited Aug. 20, 2024).

[58] Press Release, Fed. Trade Comm'n, FTC Seeks Comment on Business Practices of Cloud Computing Providers that Could Impact Competition and Data Security (March 22, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-seeks-comment-business-practices-cloud-computing-providers-could-impact-competition-data (last visited Aug. 20, 2024).

### *Companies Like Defendants Are Particularly Susceptible to Cyberattacks*

85.     Defendants were or should have been on notice that data breaches perpetuated against entities that collect, store, and maintain PCI, like Defendants, have become widespread.

86.     The number of U.S. data breaches surpassed 1,000 in 2016, a forty percent increase in the number of data breaches from the previous year.[59] In 2022, 1,802 data compromises were reported that impacted over 422 million victims—marking a 42% increase in the number of victims impacted since 2021.[60] That upward trend continues.

87.     In the first quarter of the 2024 fiscal year alone, 841 organizations experienced data breaches, resulting in 28,596,892 individuals' personal information being compromised.[61]

---

[59] CyberScout & Identity Theft Res. Ctr., *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, PR Newswire (Jan. 19, 2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html.
[60] Identity Theft Res. Ctr., 2022 Annual Data Breach Report (Jan. 2023).
[61] *See* Identity Theft Res. Ctr., *Identity Theft Resource Center Q1 2024 Data Breach Analysis: Compromises Up 90 Percent Over Q1 2023* (Apr. 10, 2024).

88.    As the number of data breaches has increased, so has the rate of identity theft complaints. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[62]

89.    Data thieves regularly target companies like Defendants due to the highly sensitive information that they keep in their custody. Defendants knew and understood that unprotected PCI is valuable and highly sought after by criminals who seek to illegally monetize that PCI through unauthorized access, sale and use of the PCI.

90.    Cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.[63]

91.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "*[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies*. They breach

---

[62] Ins. Info. Inst., Facts + Statistics: Identity Theft and Cybercrime, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Aug. 21, 2024).

[63] *See* Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-a0l55a8bb5l&utm.

networks, use specialized tools to maximize damage, **leak corporate information on dark web portals**, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[64]

92.    In September 2020, the United States Cybersecurity & Infrastructure Security Agency ("CISA") published online a "Ransomware Guide" advising that "**[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data** if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[65]

93.    Defendants knew and understood unprotected or exposed PCI in the custody of companies like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PCI through unauthorized access.

94.    Defendants knew, or should have known, the importance of safeguarding PCI entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class members as a result of

---

[64] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[65] CISA, *#StopRansomware Guide*, https://www.cisa.gov/stopransomware/ransomware-guide (last visited July 19, 2024).

a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### *The Data Breach Was Preventable*

95.     Defendants' cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Data Breach occurred.

96.     This was known and obvious to Defendants as Defendants observed frequent public announcements of data breaches affecting companies that, like Defendants, collected and maintained significant amounts of personal information, including PCI, and knew that information of the type they collected, maintained, and stored is highly coveted and a frequent target of hackers.

97.     It is well known that use of stolen credentials has long been the most popular and effective method of gaining authorized access to a company's internal networks and that companies should activate defenses to prevent such attacks.

98.     According to the FBI, phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the

most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[66]

99.     There are two primary ways to mitigate the risk of stolen credentials: user education and technical security barriers.

100.    User education is the process of making employees or other users of a network aware of common disclosure schemes and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients.

101.    Companies can also greatly reduce the flow of fraudulent e-mails by installing technical security barriers including software that scans all incoming messages for harmful attachments or malicious content and implementing certain security measures governing e-mail transmissions, including Sender Policy Framework (SPF) (e-mail authentication method used to prevent spammers from sending messages on behalf of a company's domain), DomainKeys Identified Mail (DKIM) (e-mail authentication method used to ensure messages are not altered in transit between the sending and recipient servers), and Domain-based Message Authentication, Reporting and Conformance (DMARC), which "builds on the

---

[66] Fed. Bureau Investigation, 2020 Internet Crime Report, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last visited July 25, 2024).

widely deployed [SPF] and [DKIM] protocols, adding a reporting function that allows senders and receivers to improve and monitor protection of the domain from fraudulent email."[67]

102.    CISA recommends that organizations take the following measures to detect cyber-attacks and prevent unauthorized access:

- Mitigating the risk of stolen credentials
- Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;
- Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;
- Ensuring devices are properly configured and that security features are enabled;
- Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and
- Disabling operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.[68]

103.    The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system

---

[67] CISA, *#StopRansomware Guide*,
https://www.cisa.gov/stopransomware/ransomware-guide (last visited July 19, 2024).
[68] *Id*.

that will detect potentially malicious network activity that occurs prior to ransomware deployment.[69]

104.    Defendants, like any entity storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of consumer files. Defendants' procedures and policies were below industry-standards and are inexcusable given Defendants' knowledge that they were a prime target for cyberattacks.

105.    Instead, Defendants' conduct has created a substantial risk of future identity theft, fraud, or other forms of exploitation. The data acquired in the Data Breach included unencrypted phone numbers and cell site identification numbers, which can be used to perpetuate fraud, identity theft, and other types of exploitation. For example, this data can be used in SIM swapping scams, port-out fraud,[70] and Smishing attacks.[71]

### *Allegations Relating to Plaintiff*

106.    Plaintiff Mari Miller is a citizen and resident of Michigan.

---

[69] *Id.*

[70] Andrew Regitsky, *FCC Will Update CPNI Rules to Stop Data Breaches*, CCMI, https://www.ccmi.com/fcc-will-update-cpni-rules-to-stop-data-breaches/ (last visited Aug. 20, 2024).

[71] Fed. Commc'n Comm., Avoid the Temptation of Smishing Scams (Feb. 1, 2024), https://www.fcc.gov/avoid-temptation-smishing-scams (last visited Aug. 20, 2024).

107.    Plaintiff had cell phone service from Verizon between May 1, 2022 and October 31, 2022.

108.    Between May 1, 2022 and October 31, 2022, Plaintiff frequently called or texted many AT&T customers, including family and friends. Plaintiff believes she spoke with one of her friends who was an AT&T customer at least once or twice a week during that time period.

109.    Accordingly, her PCI was disclosed as a result of Defendants' conduct.

110.    Plaintiff has suffered and will continue to suffer damages due to the Data Breach. For example, approximately two months ago Plaintiff received a text message from a number claiming to be Verizon and purporting to collect on a past due account. Plaintiff was not the primary Verizon account holder and had not previously received calls from anyone purporting to be Verizon until her PCI was exfiltrated.

111.    Plaintiff has also received similar unsolicited text messages from what appear to be financial services companies that she does not recognize, but also purport to be debt collection notices. Plaintiff has also received other unsolicited emails and text messages that appear to be from businesses selling clothing and cryptocurrency, but she does not recall consenting to receive those communications from those businesses.

112.    Earlier this year, Plaintiff was informed that her identity was compromised. Upon checking her credit report, it revealed that there were multiple addresses and a P.O. Box that she did not recognize. She also observed that her credit score fluctuated over 100 points in a month.

113.    Plaintiff did not receive notice of the Data Breach directly from Defendants.

114.    As a result of the Data Breach, Plaintiff made and will continue to make reasonable efforts to mitigate the impact of the Data Breach.

115.    Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

116.    As a result of the Data Breach, Plaintiff has suffered lost time, annoyance, interference, and inconvenience addressing and monitoring for adverse personal impacts caused by the Data Breach.

117.    For instance, Plaintiff spends significant time screening her text messages and emails to ascertain if they are legitimate or not. This has complicated her efforts to make inquiries to legitimate businesses because it requires her to recall which firms she has requested information from.

118.    Additionally, Plaintiff has also spent numerous hours monitoring her credit, a practice she will continue indefinitely to protect against fraud and identity theft. She is also spending significant time attempting to rebuild her credit score after observing large fluctuations in her credit score. She has also paid for a credit-building product to improve her credit score. This is time and money Plaintiff otherwise would have spent performing other activities.

119.    In addition, Plaintiff has suffered and will continue to suffer fear, anxiety, stress, and emotional distress as a result of the Data Breach, and has increased concerns for the loss of her privacy and the release of her PCI, which she would not have suffered had Defendants implemented the necessary and proper safeguards to protect Plaintiff's and Class members' PCI from theft.

120.    Plaintiff is particularly concerned about the disclosure of her personal information because she has worked in the financial services industry, and is aware of the severe damages she could incur as a result of financial fraud or identity theft. These injuries have been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

121.    It was reasonable and foreseeable that Plaintiff would take, and continue to take, necessary measures to protect her PCI.

122.    Plaintiff has a continuing interest in ensuring that her PCI, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from further and future breaches.

123.    As a result of the Data Breach, Plaintiff will continue to be at heightened risk for financial fraud, identity theft, and the attendant damages, for years to come.

### *Defendants Failed to Comply with FTC Guidelines*

124.    The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[72]

125.    Defendants were prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.[73]

---

[72] Fed. Trade Comm'n, *Start with Security*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 25, 2024).
[73] *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020) (citing *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)).

126.    According to the FTC, the need for data security should be factored into all business decision-making.[74]

127.    FTC guidance to companies like AT&T and Snowflake for the use of cloud services includes the following: (1) take advantage of the security features offered by cloud service companies; (2) take regular inventories of what you keep in the cloud; (3) do not store personal information when it is not necessary; (4) consider encrypting rarely used data; (5) pay attention to credible warning; (6) security is your responsibility.[75]

128.    In 2016, the FTC updated their publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[76] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand

---

[74] Fed. Trade Comm'n, *Start With Security: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 25, 2024).
[75] Elisa Jillson & Andy Hasty, Fed. Trade Comm'n, *Six steps toward more secure cloud computing* (June 15, 2020), https://www.ftc.gov/business-guidance/blog/2020/06/six-steps-toward-more-secure-cloud-computing (last visited Aug. 20, 2024).
[76] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (June 2015), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 25, 2024).

their network's vulnerabilities; and implement policies to correct any security problems.

129.    The FTC further recommends that companies not maintain PCI longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[77] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

130.    The FTC also states that outdated software undermines security, and recommends that software be updated regularly, third party patches be implemented as they are issued, and automated tools should be used to track which version of software is running and whether updates are available.[78]

131.    The FTC strongly encourages businesses to "[p]ut procedures in place to keep your security current and address vulnerabilities that may arise," including to "[c]heck expert websites (such as www.us-cert.gov) and your software

---

[77] Fed. Trade Comm'n, Start With Security: A Guide for Business, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 25, 2024).
[78] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 25, 2024).

vendors' websites regularly for alerts about new vulnerabilities, and implement policies for installing vendor-approved patches to correct problems." The FTC also cautions businesses to heed credible security warnings and move quickly to fix them. Businesses are strongly encouraged to "[h]ave an effective process in place to receive and address security vulnerability reports." [79]

132.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations. [80]

133.    Defendants were fully aware of their obligation to implement and use reasonable measures to protect the PCI they obtained from Plaintiff and Class members, but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. Defendants were also aware of the significant repercussions that would result from their failure to make good on those obligations.

---

[79] *Id*.

[80] Fed. Trade Comm'n, Privacy and Security Enforcement, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last visited July 25, 2024).

134.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class members' PCI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *Defendants Failed to Comply With Industry Standards*

135.    Several best practices have been identified that, at a minimum, should be implemented by companies in possession of PCI, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multifactor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multifactor authentication.

136.    Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

137.    In addition, to prevent and detect cyber-attacks Defendants could and should have implemented, as recommended by CISA", the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransom ware attacks . ...

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) ....

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it . ...

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters-and keep them updated-to reduce malicious network traffic….[81]

138.    To prevent cyber-attacks like the one involved here, Defendants also could and should have implemented ISO 27017, an information security framework for organizations using cloud services.

139.    ISO/IEC 27017 focuses on addressing the data privacy and security requirements for organizations using cloud services. An overview of the standard is as follows:

Overview of ISO/IEC 27017

a. **Scope**: ISO/IEC 27017 provides guidance to cloud service customers on the implementation of information security controls within the context of their use of cloud services. It complements the existing ISO/IEC 27001 standard, which is a broader information security management system (ISMS) standard.

b. **Objectives**: The standard aims to help organizations protect the confidentiality, integrity, and availability of their information in the cloud environment. It provides guidelines for addressing the risks associated with cloud computing and ensures that cloud service customers maintain control over their data.

c. **Data Classification & Handling**: ISO/IEC 27017 emphasizes the importance of classifying data based on its sensitivity and defining appropriate handling and security measures for each classification. It provides guidance on data encryption, access controls, data segregation, and data retention.

---

[81] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited July 19, 2024).

d. **Security Responsibilities**: The standard clarifies the division of security responsibilities between the cloud service customer and the cloud service provider. It outlines the areas where the customer retains control and where the provider assumes responsibility. This helps establish clear expectations and accountability for security measures.

e. **Supplier Management**: ISO/IEC 27017 emphasizes the need for cloud service customers to assess the security capabilities of their cloud service providers. It provides guidance on selecting trustworthy providers, establishing contractual agreements, and monitoring the provider's compliance with security requirements.

f. **Incident Management**: The standard addresses incident management processes in the cloud environment. It provides guidance on incident reporting, investigation, and response to ensure timely and effective handling of security incidents.

g. **Continual Improvement**: ISO/IEC 27017 promotes a continual improvement approach to information security in the cloud. It encourages organizations to regularly review and update their security controls, assess emerging risks, and implement necessary improvements.

140.    ISO/IEC 27017 provides guidance on MFA as a security control for cloud service customers. The standard provides, among other things, the following security requirements:

a. **Authentication Requirements**: The standard emphasizes the importance of strong authentication mechanisms for accessing cloud services. It recommends the use of MFA as an effective method to enhance the security of user authentication. MFA requires users to provide multiple forms of identification, such as a password and a unique code or biometric factor, to verify their identity.

b. **Risk Assessment**: ISO/IEC 27017 encourages cloud service customers to conduct a risk assessment to determine the level of authentication controls required based on the sensitivity of the data and the potential impact of unauthorized access. MFA is often recommended for high-risk or sensitive applications or data.

46

c. **Access Controls**: The standard provides guidance on implementing access controls in the cloud environment. It suggests that MFA should be used as an additional layer of security in conjunction with other access control measures such as strong passwords, role-based access control (RBAC), and least privilege principles.

d. **User Management**: ISO/IEC 27017 highlights the need for effective user management practices in the cloud. It recommends implementing MFA for user accounts with administrative privileges or access to sensitive data. This helps prevent unauthorized access even if the user's password is compromised.

e. **Supplier Management**: The standard advises cloud service customers to assess the authentication capabilities of their cloud service providers. It recommends selecting providers that offer robust MFA options and have appropriate controls in place to protect customer data.

f. **Compliance Monitoring**: ISO/IEC 27017 suggests that organizations should monitor and review the effectiveness of their MFA controls regularly. This includes monitoring user access logs, analyzing authentication success/failure rates, and promptly addressing any security incidents or vulnerabilities related to authentication.

141.    ISO/IEC 27017 helps cloud service customers, like AT&T, strengthen their authentication processes, reduce the risk of unauthorized access, and enhance the overall security of their cloud services.

142.    The foregoing frameworks are established and applicable industry standards for data security, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***Cybercriminals Have and Will Continue to Use Plaintiff's and Class members' PCI for Nefarious Purposes***

143.     Plaintiff's and Class members' PCI is of great value to cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways for criminals to exploit Plaintiff and the Class members and to profit off their misfortune and stolen information. The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access systems, including Defendants' systems, in order to obtain valuable PCI to sell on the dark web.

144.     Criminals can and do piece together bits and pieces of compromised personal information for profit, for example by developing "Fullz" packages.[82]

---

[82] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm,* Krebs on Sec. (Sep. 18, 2014) https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited July 15, 2024).

145.    With "Fullz" packages, cyber-criminals can cross-reference two sources of personal information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

146.    Then, this comprehensive dossier can be sold-and then resold in perpetuity-to crooked operators and other criminals (like illegal and scam telemarketers).

147.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PCI is stolen and when it is used.

148.    According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[83]

149.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal

---

[83] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited July 15, 2024).

personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

150.    Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their PCI.

151.    Furthermore, Plaintiff and Class members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime,

where their names, cellular data, and contact information were acquired in the Data Breach. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to Defendants' conduct.

### ***Defendants Owed a Duty to Plaintiff and Class members to Keep Their PCI Secure and Protect It From Being Compromised, Lost, Stolen, Accessed, or Misused***

152.    In addition to their obligations under state and federal laws and regulations, Defendants owed a common law duty to Plaintiff and Class members to protect PCI entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PCI in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties. This duty extends to Defendants' obligations to safeguard PCI shared with subcontractors and service vendors who received PCI from Defendant, and to conduct ongoing, robust due diligence into such subcontractors and service vendors prior to contracting and throughout any relationship.

153.    Defendants further owed and breached their duties to Plaintiff and Class members to implement processes and specifications that would detect a breach of Defendants' security systems in a timely manner and to timely act upon warnings and alerts, including those generated by Defendants' own security systems. Instead of implementing such processes and specifications, Defendants

allowed the Data Breach to go undetected for months (and possibly years) before recognizing unusual activity.

154.    As a direct result of Defendants' intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, cyber attackers were able to access, acquire, view, publicize, and/or otherwise cause the theft and misuse to Plaintiff's and Class members' PCI as detailed above, and Plaintiff is now at a heightened and ongoing risk of identity theft and fraud.

155.    The Data Breach was a direct and proximate result of Defendants' failure to: (a) properly safeguard and protect Plaintiff's and Class members' PCI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class members' PCI; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

156.    Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite their obligation to protect Plaintiff's and Class members' data, including their PCI.

157.    Had Defendants remedied the deficiencies in Defendants' data security systems and adopted security measures recommended by experts in the

field, it would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiff's and Class members' PCI.

### *Loss of Time to Mitigate Risk of Identity Theft & Fraud and Other Impacts of the Data Breach on Victims*

158.    Time is a compensable and valuable resource in the United States.

159.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their person information, including PCI, was compromised, as in this Data Breach, a reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

160.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class members must monitor their financial and other accounts and otherwise take ongoing steps to mitigate the risk of fraud and identity theft for many years.

161.    Plaintiff and Class members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, contacting credit bureaus to place freezes on their accounts, and closely monitoring their email accounts, voice mail, and texts

for phishing, smishing, and vishing attacks, SIM swaps, and other forms of social engineering and fraudulent activity.

162.    Plaintiff's mitigation efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach.[84]

163.    Many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and statements, checking credit reports, and spending time and effort searching for unauthorized activity.

164.    It is no wonder then that identity theft exacts a severe emotional and physical toll on their victims.[85]

165.    The unauthorized disclosure of the PCI to data thieves also deprives their owner of their value, which has been recognized by courts as an independent form of harm.[86]

---

[84] *See* Fed. Trade Comm'n, IdentityTheft.gov, *Steps: What To Do Right Away*, https://www.identitytheft.gov/Steps (last visited July 15, 2024).
[85] *Identity Theft: The Aftermath 2017*, ITRC, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited July 25, 2024).
[86] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense

166.    Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

167.    As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.    the unconsented disclosure of confidential information to a third party;

b.    losing the value of the explicit and implicit promises of data security;

c.    identity theft and fraud resulting from the theft of their PCI;

d.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

e.    anxiety, emotional distress, and loss of privacy;

---

compels it to acknowledge— the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

f.   costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

g.   lowered credit scores resulting from credit inquiries following fraudulent activities;

h.   costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

i.   the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PCI being in the possession of one or many unauthorized third parties.

168.   Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement.

169.   The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes,

29% spent a month or more resolving problems" and that "[r]esolving the problems caused by identity theft [could] take more than a year for some victims."[87]

170.    Plaintiff and Class members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[88]

171.    Plaintiff and Class members have a direct interest in Defendants' promises and duties to protect their PCI, *i.e.*, that Defendants *not increase* their risk of identity theft and fraud. Because Defendants failed to live up to their promises and duties in this respect, Plaintiff and Class members seek the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendants' wrongful conduct. Through this remedy, Plaintiff seeks to restore herself and Class members as close

---

[87] Erika Harrell, & Lynn Langton, U.S. Dep't of Just., Off. of Just. Programs Bureau of Just. Stats., *Victims of Identity Theft, 2012*, (Dec. 2013), https://www.bjs.gov/content/pub/pdf/vit12.pdf.
[88] *Beyond the Bottom Line: The Real Cost of Data Breaches*, FireEye (Oct. 23, 2018), https://library.cyentia.com/report/report_001510.html.

to the same position as they would have occupied but for Defendants' wrongful conduct, namely Defendants' failure to adequately protect Plaintiff's and Class members' PCI.

172.    Plaintiff and Class members further seek to recover the value of the unauthorized access to their PCI permitted through Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PCI is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class members have a protectible property interest in their  PCI; (b) the minimum damages measure for the unauthorized use of personal property is their rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

173.    Because Defendants continue to hold the PCI of Plaintiff and Class members, Plaintiff and Class members have an undeniable interest in ensuring that their PCI is secured, remains secure, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

174.    Plaintiff brings this class action on behalf of herself and all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure and Local Rule 23.1.

175.    **Class Definition**: The Class that Plaintiff seeks to represent is defined as follows:

- All non-AT&T customers whose PCI was compromised in the Data Breach.

176.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

177.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

178.    **Numerosity, Fed. R. Civ. P. 23(a)(1)**: The members of the Class are so numerous that joinder of all of them is impracticable. There are over 316 million mobile phone numbers in use in the United States, the non-AT&T customers comprise hundreds of millions of people who interacted with AT&T customers and thus had their PCI exposed in the Data Breach, and so are members of the proposed Class. The Class is readily identifiable within Defendants' records.

179.    **Commonality and Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class members. These common questions of law and fact are such that there is a well-defined community of interest in this litigation. The common questions of law and fact include, without limitation:

   a. Whether Defendants owed Plaintiff and Class members a duty to implement and maintain reasonable security procedures and practices to protect their PCI;

   b. Whether Defendants violated their duty to implement reasonable security systems to protect Plaintiff's and Class members' PCI;

c.  Whether Defendants' breach of their duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class members;

d.  Whether Defendants owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their PCI;

e.  Whether Defendants violated their duty to exercise due care in collecting, storing, safeguarding, and/or obtaining their PCI;

f.  Whether Defendants' breach of their duty to exercise due care in collecting, storing, safeguarding, and/or obtaining their PCI directly and/or proximately caused damages to Plaintiff and Class members;

g.  Whether Defendants acted negligently in connection with the monitoring and/or protection of Plaintiff's and Class members' PCI;

h.  Whether Defendants adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

i.  Whether Defendants and class members are entitled to damages to pay for future protective measures like credit monitoring and monitoring for misuse of PCI;

j.  Whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach; and

k.  Whether Class members are entitled to compensatory damages, nominal damages, and/or punitive damages as a result of the Data Breach.

180.  **Typicality, Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the claims of the members of the Class because all class members had their PCI compromised in the Data Breach and were harmed as a result.

181.  **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

182.  **Adequacy, Fed. R. Civ. P. 23(a)(4)**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no known interest antagonistic to those of the Class and his interests are aligned with Class members'

interests. Plaintiff was subject to the same Data Breach as class members, suffered similar harms, and face similar threats due to the Data Breach. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including data breach cases involving multiple classes and data breach claims.

183. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

184. The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs

alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of the Class with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

185.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

186.    Adequate notice can be given to Class members directly using information maintained in Defendants' records.

187.    Unless a classwide injunction is issued, Plaintiff and Class members remain at risk that Defendants will continue to fail to properly secure the PCI of Plaintiff and Class members resulting in another data breach, continue to refuse to provide proper notification to Class members regarding the Data Breach, and continue to act unlawfully as set forth in this Class Action Complaint.

188.   Defendants acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

189.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

- Whether Defendants owed a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their PCI;

- Whether Defendants breached a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their PCI;

- Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

- Whether Defendants failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the

nature and scope of the information compromised in the Data

Breach; and

- Whether Class members are entitled to actual damages, additional credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

### CLAIMS FOR RELIEF

### COUNT I
**Negligence**
*(On Behalf of Plaintiff and the Class)*

190.    Plaintiff repeats and realleges every preceding allegation as though fully set forth herein.

191.    Defendants gathered and stored the PCI of Plaintiff and Class members in the ordinary course of providing telecommunications services (AT&T) and data storage services (Snowflake), which services affect commerce, as well as for their own financial gain.

192.    Plaintiff and Class members entrusted Defendants with their PCI with the understanding that Defendants would safeguard their information.

193.     Defendants knew, or should have known, of the risks inherent in collecting and storing the PCI of Plaintiff and Class members.

194.    As described above, Defendants owed duties of care to Plaintiff and Class members whose PCI had been entrusted with Defendants.

195.    The duties of care owed by Defendants include a duty to exercise reasonable care in protecting Plaintiff's and Class members' PCI from unauthorized disclosure or access.

196.    Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

197.    The duties of care owed by Defendants also include a duty to provide adequate data security, consistent with industry standards, to ensure that Defendants' systems and networks adequately protected Plaintiff's and Class members' PCI.

198.    Defendants' duty to use reasonable care in protecting Plaintiff's and Class members' PCI arises as a result of the parties' relationship, as well as common law and federal law, including Defendants' own policies and promises regarding privacy and data security.

199.    Defendants breached their duty to Plaintiff and Class members in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PCI of Plaintiff and Class members;
- Failing to comply with industry standard data security measures for the financial industry leading up to the Data Breach;
- Failing to comply with their own privacy policies;
- Failing to comply with regulations protecting the PCI at issue during the period of the Data Breach;
- Failing to adequately monitor, evaluate, and ensure the security of Defendants' network and systems; and
- Failing to recognize in a timely manner that PCI had been compromised.

200.    Defendants also had a duty to Plaintiff and the Class under the FTC Act.

201.    The FTC Act prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC.

202.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate data security practices to safeguard Plaintiff's and Class members' PCI.

203.    The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

204.    Plaintiff and Class members were within the class of persons the Federal Trade Commission Act was intended to protect.

205.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement

actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class members.

206.    Defendants have admitted that the PCI of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons, and released on the dark web, as a result of the Data Breach.

207.    Plaintiff further believes her PCI and that of Class members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

208.    Defendants therefore breached their duty to Plaintiff and the Class by violating Section 5 of the FTC Act by failing to use reasonable measures to protect PCI and not complying with applicable industry standards, as described in detail herein.

209.    Defendants' conduct was particularly unreasonable given the nature and amount of PCI Defendants collected and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

210.    Defendants acted with wanton disregard for the security of Plaintiff's and Class members' PCI. Defendants knew or reasonably should have known that they had inadequate data security practices to safeguard such information, and

Defendants knew or should have known that data thieves were attempting to access databases containing PCI such as that entrusted to Defendants.

211.  Plaintiff's and Class members' PCI would not have been compromised but for Defendants' wrongful and negligent breach of their duties.

212.  But for Defendants' wrongful and negligent breaches of the duties owed to Plaintiff and the Class members, Plaintiff and the Class members would not have been injured.

213.  Defendants' failure to take proper security measures to protect the PCI of Plaintiff and Class members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and copying of PCI by unauthorized third parties. Given that companies such as Defendants are prime targets for hackers, Plaintiff and Class members are part of a foreseeable, discernible group that was at high risk of having their PCI misused or disclosed if not adequately protected by Defendants.

214.  It was also foreseeable that Defendants' failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff and Class members.

215.  As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have and will suffer damages in an amount to be proven at trial, including: (i) the loss of rental or use value of their PCI; (ii) the unconsented

disclosure of their PCI to unauthorized third parties; (iii) out-of- pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PCI; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PCI, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PCI for the rest of their lives; and (ix) any nominal damages that may be awarded.

## COUNT II
### Breach of Third-Party Beneficiary Contract
### *(On Behalf of Plaintiff and the Class)*

216.    Plaintiff repeats and realleges every preceding allegation as though fully set forth herein.

217. Acting in the ordinary course of business, Snowflake entered into various contracts with its customers, including AT&T, to provide data storage services to its customers.

218. Upon information and believe, these contracts are virtually identical to each other.

219. Upon information and belief, each of those respective contracts contained provisions requiring Snowflake and its customers, including AT&T, to protect the PCI that Snowflake received from its customers in carrying out the business of the contract.

220. Upon information and belief, these provisions requiring Defendants acting in the ordinary course of business to protect the PCI they collected by Snowflake's customers and stored by Snowflake were intentionally included for the direct benefit of Plaintiff and Class members, as it was their confidential information that Defendants agreed to collect, store, and protect through their services. Thus, the benefit of collection and protection of the PCI belonging to Plaintiff and the Class were the direct and primary objective of the contracting parties, such that Plaintiff and Class members are intended third-party beneficiaries of these contracts, and therefore entitled to enforce them.

221. Defendants knew that if they were to breach these contracts, consumers, including Plaintiff and the Class members, would be harmed.

222.    Defendants breached these contracts while acting in the ordinary course of business by failing to utilize adequate data security practices to safeguard Plaintiff's and Class members' PCI, and by otherwise not protecting Plaintiff's and Class members' PCI, as stated herein.

223.    Plaintiff and Class members were harmed by Defendants' breaches in failing to use reasonable data security measures to safely maintain and protect Plaintiff's and Class members' PCI.

224.    As a direct and proximate result of Defendants' breaches, Plaintiff and Class members sustained actual losses and damages described in detail herein, in an amount to be proven at trial. Plaintiff and Class members alternatively seek an award of nominal damages.

## COUNT III
### Declaratory Judgment
#### (On Behalf of Plaintiff and the Class)

225.    Plaintiff repeats and realleges every preceding allegation as though fully set forth herein.

226.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

227.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard PCI and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class members from further cyberattacks and data breaches that could compromise their PCI.

228.    Defendants still possess PCI pertaining to Plaintiff and Class members, which means their PCI remains at risk of further breaches because Defendants' data security measures remain inadequate. Plaintiff and Class members continue to suffer injuries as a result of the compromise of their PCI and remain at an imminent risk that additional compromises of their PCI will occur in the future.

229.    Pursuant to the Declaratory Judgment Act, Plaintiff seeks a declaration that: (a) Defendants' existing data security measures do not comply with their obligations and duties of care; and (b) in order to comply with their obligations and duties of care, (1) Defendants must have policies and procedures in place to ensure the parties with whom Defendants share sensitive personal information maintain reasonable, industry-standard security measures, including, but not limited to, those listed at (ii), (a)-(i), *infra*, and must comply with those policies and procedures; (2) Defendants must: (i) purge, delete, or destroy in a reasonably secure manner Plaintiff's and Class members' PCI if it is no longer necessary to perform essential business functions so that it is not subject to further theft; and (ii)

implement and maintain reasonable, industry-standard security measures, including, but not limited to:

    a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

    c. Auditing, testing, and training their security personnel regarding any new or modified procedures;

    d. Encrypting PCI and segmenting PCI by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of their systems;

    e. Purging, deleting, and destroying in a reasonable and secure manner PCI not necessary to perform essential business functions;

    f. Conducting regular database scanning and security checks;

    g. Conducting regular employee education regarding best security practices;

h. Implementing multi-factor authentication and POLP to combat system-wide cyberattacks; and

i. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff, on behalf of herself and the Class set forth herein, respectfully requests the following relief:

A.    That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is the proper class representative; and appoint Plaintiff's counsel as Class Counsel;

B.    That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiff and Class members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.    That the Court award punitive or exemplary damages, to the extent permitted by law;

E.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

F.      That Plaintiff be granted the declaratory and injunctive relief sought herein;

G.      That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

H.      That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in the instant action.


September 3, 2024.


PARSONS BEHLE & LATIMER
*Counsel for Plaintiff and Proposed Class*

/s/ Jesse Kodadek
Jesse Kodadek